UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

KEVIN STERLING                                   CIVIL ACTION

v.                                               NO. 17-0742

DAVID BERNHARDT, Acting Secretary,               SECTION "F"
U.S. DEPARTMENT OF THE INTERIOR, ET AL.

ORDER AND REASONS

Before the Court is the defendants' motion to dismiss and/or alternatively for summary judgment.  For the reasons that follow, the motion is GRANTED.

**Background**

This lawsuit challenges the U.S. Department of the Interior's employment practices, including allegations that an employee was tasked with duties beyond his pay grade, but received delayed reclassification (or no corresponding increase in pay and no back pay) due to his race, and that he suffered retaliation in the form of additional work and delayed reclassification after complaining about the unlawful employment practices.

1

Following a 21-year career in the oil and gas industry, Kevin Sterling, an African American male, began working as a GS-1801-11 Inspector for the Bureau of Safety and Environmental Enforcement (BSEE), Gulf of Mexico Region, in 2008.[1]  In May 2011, Sterling was promoted to a Safety and Environmental Management Specialist, as a GS-0301-12.  While working in that capacity under Glynn Breaux, Sterling was cross-trained to work on Civil Penalty cases (CPs), which is how BSEE assesses oil and gas operators for safety or environmental violations.

Civil Penalty cases start with an Incident of Non-Compliance, which is a referral from a district level BSEE Inspector in the field. The Incident of Non-Compliance and supporting documentation are reviewed at the regional level in the Office of Safety Management (OSM) to determine the extent of the violation and the amount of penalty to be assessed.  Beginning in November 2012, Sterling served as the panel chair for an Accident Investigation Panel charged with investigating an accident involving Black Elk Energy Offshore Operations, LLC.

Safety and Environmental Management work decreased in late 2013, causing an uptick in Civil Penalty review work.  In early

---

[1] Sterling has a Bachelor of Science degree in Business Administration; he has taken several engineering courses, but he does not have an engineering degree.

2014, Breaux began cross-training Safety and Environmental Specialists in Civil Penalty work, which was previously only performed by the GS-0881 Petroleum Engineers or GS-1801 Inspectors in the Office of Safety Management. As of January 8, 2014, Sterling testified that he was cross-trained as a Civil Penalty reviewing officer; he helped with backlogged cases. By April 2014, Sterling was recognized as the fourth Civil Penalty reviewing officer; however, he continued to be compensated as a 0301 series employee, while the other Civil Penalty Review officers, who were engineers, were 0881 series employees.

In August 2014, BSEE began paying workers in the 1801 series a 35% enhanced retention special pay rate. A few months later, the Director for the BSEE Gulf of Mexico Region, Lars Herbst, initiated an effort to reclassify workers in the 0301 Series,[2] like Sterling, to the 1801 Series. However, this initiative was delayed while BSEE studied and underwent a reorganization in 2015.

That his position description failed to reflect the Civil Penalty review work he was actually performing prompted Sterling in September 2015 to request that his then-supervisor Jason

---

[2] There were three other Safety and Environmental Management Specialists: Rob Carroll and Matt Nagy, both Caucasians, and Roderick Belson, an African American.

3

Mathews[3] initiate a Desk Audit so that Sterling could be reclassified into an 1801 Series position.  Rather than initiating a Desk Audit, Mathews determined that it would be more effective to draft a new position description for Sterling.[4]  But Mathews' first attempt to write a new position description was not accepted by Vanessa Matthews, the Human Resources Manager for BSEE, Gulf of Mexico Region.  Ms. Matthews determined that the draft position description too closely resembled the one held by the Petroleum Engineers; Sterling did not have an engineering degree.[5]  Mr. Mathews was told to write a new position description.  Meanwhile, by November 2015, Sterling initiated his first informal EEOC complaint, alleging desk audit denial; he officially filed the

_____

[3] Mathews had replaced Glynn Breaux, who retired.  Mathews supervised Sterling from April 2015 until the OSM was realigned near the end of 2015, at which time Stephen Kovacs became Sterling's supervisor.

[4] Explaining the difference between a position description change and a desk audit, Mathews testified:

[A] desk audit is they would take your PD, your position description, and audit against that to see if you were doing what you were supposed to be doing.  Kevin was not doing anything on his position description [he was still a Safety and Environmental Management specialist] so my recommendation was to draft a new PD, position description, and have that reclassified by personnel.

[5] According to Ms. Matthews, the proffered position description for Sterling was problematic because it begged the question of whether an engineering degree should be required to carry out Civil Penalty review work

4

EEOC complaint on December 21, 2015.  Sterling alleges that he was denied timely reclassification and appropriate compensation because of his race.[6]

At the same time Sterling made his informal EEO complaint regarding desk audit denial, in November 2015, BSEE underwent a national reorganization.  Stephen Kovacs, the new Office of Enforcement supervisor, became Sterling's supervisor and was tasked with rewriting Sterling's position description.  Sterling inquired about the status of his new position description in mid-February 2016.  Kovacs asked his supervisor, Mike Prendergast, for assistance.  By this time, Vanessa Matthews had retired; Kovacs worked on drafting the new position description for Sterling with Derek Childress, a classification specialist out of BSEE's Virginia headquarters.  With input from Sterling, Childress and Kovacs collaborated on Sterling's new position description.  In early May 2016, Kovacs submitted the final version, which was

---

[6] The issue accepted for investigation was whether Sterling was subject to racial discrimination when, from September 14, 2015 to the end of the investigation on June 9, 2016, management failed to process his request for a desk audit/reclassification of his GS-301-13, Safety and Environmental Management Specialist position. During the EEO investigation, Sterling names five Caucasian comparators whom he alleges were treated more favorably than himself: Tim McGraw, David Dykes, Cathy Moser, Charles Arnold, and Joel Moore.

reviewed by a contractor for Childress.[7]   On July 10, 2016, Sterling's new position description became effective; he was officially reassigned from a Series 0301 position to an Enforcement Coordinator for Civil Penalties, GS-1801-13.   From then on, Sterling was paid according to the special pay rate table. However, he was not eligible for back pay.[8]

Just two weeks before he was reclassified as an Enforcement Coordinator for Civil Penalties, on June 27, 2016, Sterling initiated another EEO complaint in which he alleged that, shortly

---

[7] Childress advised that there would be further delay before Sterling's new position description was approved because it had to be reviewed by a contractor who had been hired to carry out position description review throughout BSEE during the ongoing reorganization.

[8] According to the Introduction to the Position Classification Standards issued by the U.S. Office of Personnel Management, an employee's pay entitlements begin on the effective date of the personnel action that assigns the employee to the reclassified position.   The appendix explains:

It has long been the rule of this office that a personnel action may not be made effective retroactively so as to increase the right of an employee to compensation. It is also an established rule that employees of the Federal Government are entitled only to the salaries of the positions to which they are actually appointed regardless of the duties they perform.  When an employee performs duties at a grade level higher than that in which his position is classified and is successful in obtaining reclassification of his/her position and promotion, no entitlement exists for compensation at the higher grade level prior to the date the necessary administrative actions are taken to effect the promotion.

after he filed his first formal discrimination complaint, he was subject to reprisal.  Sterling cited three instances of retaliation: (1) a Civil Penalty case, W&T (Nabors) in which he assessed a nearly $1 million fine, had been remanded at the request of the agency's Solicitor General in March 2016; (2) two of his Civil Penalty cases were selected by the Solicitor's office for inclusion in a study (CP Pilot Program) to determine whether the agency's time guidelines for processing CPs should be adjusted; and (3) Sterling still had not been given a new position description that accurately reflected his duties.  The second EEO complaint was officially filed on August 8, 2016.[9]

Civil Penalty cases such as the Nabors case start with a district office drafting a Notice of Non-Compliance, which undergoes a multilevel review in the district office before the assessment of a civil penalty supported by evidence.[10]  The Civil Penalty case is then forwarded to the regional office (Office of Enforcement) and is assigned to a Civil Penalty Review Officer

---

[9] During the time relevant to the second EEO complaint, Sterling's first line supervisor was Stephen Kovacs, Section Chief of the Office of Enforcement.  His second line supervisor was Michael Prendergast, Deputy Regional Director, BSEE.  Both were aware of Sterling's prior EEO activity.

[10] A Civil Penalty is a monetary assessment issued to a company or operator for a violation of agency regulations. It is intended to facilitate compliance with agency rules and regulations.

such as Sterling.[11]   The Nabors case was assigned to Sterling originally; he was charged with evaluating the evidence for the Notice of Non-Compliance and then drafting a Notice of Proposed Civil Penalty.   Sterling issued a final decision or "Notice of Proposed Civil Penalty" to W&T (Nabors) assessing a $990,000 civil penalty for violation of BSEE regulations.   W&T (Nabors) appealed the Civil Penalty to the Interior Board of Land Appeals.   BSEE consulted with the Solicitor's Office in Washington, D.C., and elected to remand the case, rather than proceed with the Civil Penalty as originally issued.   The Civil Penalty was remanded to the Agency and thus returned to Sterling so that the final decision could be rescinded and reissued after review and further analysis; the reason given for remand was to give BSEE a chance to make a stronger case.[12]

---

[11] The Office of Enforcement was composed of the Supervisor, Stephen Kovacs, two engineers, a secretary, and Sterling.  Whether or not there was an equal distribution of assignment of Civil Penalty cases among the office is disputed.  Sterling submits that he was assigned more cases.  In support of his contention that he was assigned "an inordinately large number of cases" and that he "was assigned more cases due to experience level, work product level, and turn-around time," Sterling cites to his own testimony during the first EEO investigation, but there is nothing there to support his contention that he was assigned more cases.  He suggested only that Civil Penalty review work was behind schedule and he completed work on time and "helped to bring things up to speed."

[12] Sterling contends that the decision to remand was a decision by Margaret Schneider and David Fish.  Relative to the remand, Mr. Fish sent an email notifying Michael Prendergast, Kevin Sterling,

This was the first time that a Civil Penalty case had been remanded.  Neither Sterling nor his supervisor, Kovacs, were given any guidance on the remand.  Like Sterling, Kovacs thought that the case should not have been remanded: indeed, the case was remanded even after Sterling and Kovacs told headquarters that the "new evidence," which was submitted by Nabors in support of its appeal of the Civil Penalty, was comprised of false affidavits.  The remand was a BSEE headquarters decision (through David Fish[13] and Mary Aubry[14]).

Sterling and Kovacs had several telephone conferences about the W&T (Nabors) civil penalty case.  Sterling contended in his EEO complaint and testified in his deposition relative to the second EEO complaint that he believes the remand was retaliatory

---

and others (including Margaret Schneider and Mary Aubry) that the case was being remanded.  Sterling explained that the company appealed the penalty assessment and that management decided to remand the case instead of defending his penalty assessment in court.

[13] Mr. Fish was the Chief of Environmental Compliance, BSEE. He works in Washington, D.C.  He has never met Mr. Sterling and has no knowledge of Sterling's race, color, or age.  He had no knowledge of Sterling's EEO activity until after Sterling filed his second complaint; he was contacted by Human Resources for some documents in February or March 2016.  He assisted in the management of the CP Program.

[14] Mary Aubrey, Assistant U.S. Attorney for the Eastern District of Tennessee, was on detail to BSEE from February 2012 to March 31, 2017.  Ms. Aubrey has never met Sterling.  She learned about Sterling's second EEO complaint around October 2016.  She has no knowledge of Sterling's race or age.  She also assisted in the CP Pilot Program.

because "no other cases have been remanded before...management couldn't even give a good reason on why they remanded." Sterling also suggests that the timing of the remand on the heels of his prior EEO complaint coupled with the fact that the decision to remand the case was made in spite of falsified affidavits executed by W&T (Nabors) supports his retaliation theory.

Shortly after Sterling received an email confirming the remand of the Nabors case, he received an email notifying him that two of his cases had been assigned to the Civil Penalty Pilot Program.[15] The Civil Penalty Pilot Program was a BSEE Headquarters initiated study whose purpose was to streamline the Civil Penalty Process; it was initiated to track the timeline from the issuance of an Incident of Non-Compliance to the issuance of a Civil Penalty and determine how long the process took and whether the timeline established by Headquarters was realistic or needed to be revised. The Pilot Program intended to determine whether the process to review and assess each case could be accomplished within 60 to 90 days, instead of the 90 day benchmark.  The pilot program was started in the summer of 2015 by Dianne Shawley in BSEE Headquarters in Sterling, Virginia.

---

[15] Sterling submits that four out of the five cases assigned to the Program were his cases.

The CP Pilot Program lasted until May 18, 2016 and was considered a success in meeting its goals and, as a result, the CP roadmap was to be revised to more accurately reflect the processes in the field.  The Civil Penalty Referral and Assessment guide calls for Civil Penalty Review Officers to complete their review and assessment within 60 to 90 days.  It also indicated the need for additional future staffing and called for the creation of a District or Program Office Case File Developer, a newly established function to assist with referrals of Civil Penalty cases.  Sterling thought the Civil Penalty Pilot Program was a great idea because he believed that his colleagues were not meeting the 90-day prescribed timeline for completing the penalty case review assessment.

The CP Pilot Program consisted of numerous telephone conference calls, sometimes weekly, among various agency employees (including Sterling on two occasions) in the field and in headquarters; the participants discussed the status of the cases being tracked.  Sterling was invited to participate in a telephone conference on March 29, 2016 along with other employees about the Civil Penalty Pilot Program.  During the conference, the two test cases that were previously selected by BSEE Headquarters for

inclusion in the Pilot Program were discussed.[16]  Both cases, Walter and Hercules, which involved the same incident, happened to be Sterling's due to the order in which they arrived in the Enforcement Section.[17]  Sterling had two other cases assigned to the CP Pilot Program.

Both of Sterling's administrative EEO complaints were investigated; Sterling forewent an EEO hearing and final agency decision.  Sterling sued Sally Jewell in her then-official capacity as Secretary of the Department of the Interior; he also named as defendants the Department of the Interior and the Bureau of Safety and Environmental Enforcement.  Sterling later filed an amended complaint replacing Jewell with Ryan Zinke as the Secretary of the Department of the Interior, but he continued to name as additional defendants the Department of the Interior and the Bureau of Safety and Environmental Enforcement.[18]  He alleges that the defendants engaged in unlawful employment practices including disparate treatment, based on his race, which prevented him from receiving earned pay increases and promotion opportunities, and that the

---

[16] Diane Shawley (now retired), Senior Advisor for Enforcement Programs, BSEE, selected the cases for the CP Pilot Program.

[17] Sterling contests that these two cases were coincidentally selected for inclusion in the Pilot Program; he claims it was an act of retaliation meant to undermine his effectiveness and reputation and force him to quit.

[18] Zinke has since resigned; David Bernhardt is Acting Secretary. See Fed. R. Civ. P. 25(d).

defendants retaliated against him after he filed an EEO complaint, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. and the Louisiana Employment Discrimination Law.  The defendants now move for summary judgment or dismissal of the plaintiff's claims.


I.

*A.*

The subject matter jurisdiction of federal courts is limited. Kokkonen v. Guardina Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Indeed, "[i]t is to be presumed that a cause lies outside this limited jurisdiction," the Supreme Court has observed, "and the burden of establishing the contrary rests upon the party asserting jurisdiction."  Id. (citations omitted); King v. U.S. Dep't of Veterans Affairs, 728 F.3d 410, 416 (5th Cir. 2013); Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001). Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A lawsuit must be dismissed if it appears that the Court lacks subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1), (h)(3).

The Court may find a plausible set of facts to support subject matter jurisdiction by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996).

*B.*

In addition to the jurisdictional challenge, the defendants also seek dismissal of the plaintiff's claims for failure to state a claim under Rule 12(b)(6).  The standard of review applicable to motions to dismiss under Rule 12(b)(1) is similar to that applicable to motions to dismiss under Rule 12(b)(6).  See Williams v. Wynne, 533 F.3d 360, 364-65 n.2 (5th Cir. 2008)(observing that the Rule 12(b)(1) and Rule 12(b)(6) standards are similar, but noting that applying the Rule 12(b)(1) standard permits the Court to consider a broader range of materials in resolving the motion). Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted.  Such a motion is rarely granted because it is viewed with disfavor.  See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser

Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc._, 677 F.2d 1045, 1050 (5th Cir. 1982)).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed. R. Civ. P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014) (citing Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 854 (5th Cir. 2012)(en banc)). But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true. Id. at 502-03 (citing Iqbal, 556 U.S. at 678).

To survive dismissal, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation

15

marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

16

*C.*

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with

competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2).  "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted).  In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).  Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

II.

*A.*

In addition to Title VII claims, Sterling alleges that the defendants' employment practices violate Louisiana employment discrimination law.  The defendants contend that these state law causes of action must be dismissed.  The Court agrees.

Redress for federal employment discrimination is limited to Section 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.  Brown v. General Serv. Admin., 425 U.S. 820, 829 (1976) (holding that Section 717 of the Civil Rights Act of 1964 "provides the exclusive judicial remedy for claims of discrimination in federal employment."); see also Jackson v. Widnall, 99 F.3d 710, 716 (5th Cir. 1996)("Insofar as [the plaintiff's] allegations of constitutional violations arise out of the same facts as his employment discrimination claims,...they are preempted by title VII and cannot afford an independent ground for relief."); see also Hampton v. I.R.S., 913 F.2d 180, 182-83 (5th Cir. 1990)("It is well settled that the provisions of Title VII of the Civil Rights Act applicable to claims of racial discrimination in federal employment are the exclusive and preemptive remedy for such claims.").  Because Title VII provides the exclusive remedy for

employment discrimination claims raised by federal employees, Sterling's state law causes of action must be dismissed.

*B.*

In addition to naming the Secretary of the Department of the Interior as a defendant, Sterling also named as defendants the Department of the Interior and the Bureau of Safety and Environmental Enforcement. The defendants contend Sterling's claims against the Department and the Bureau must be dismissed because only the head of an agency is the appropriate defendant in an employment discrimination action under Title VII. Again, the Court agrees.

The proper defendant in a Title VII claim is the head of the department or agency. 42 U.S.C. § 2000e-16(c)("the head of the department, agency, or unit...shall be the defendant" in any civil action filed); Honeycutt v. Long, 861 F.2d 1346, 1349 (5th Cir. 1988)(applying the relevant statutory provisions and holding that the proper defendant would be the head of the Department of the Defense, the Secretary of Defense, rather than the Commander of the Army & Air Force Exchange Service, which is itself a part of the Department of Defense). It was improper for Sterling to name as defendants the Department of the Interior and the Bureau of

Safety and Environmental Enforcement; thus, his claims against them must be dismissed.

### III.
#### *A.*

Title VII of the Civil Rights Act of 1964 was enacted "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973). It prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Employers are also precluded from retaliation, or "discriminat[ing] against" any employee or job applicant because that individual "has opposed any practice" made unlawful by Title VII or because that individual has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. See 42 U.S.C. § 2000e-3(a); see also LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 388 (5th Cir. 2007)(quoting 42 U.S.C. § 2000e-3). Similarly,

the federal employment provision of Title VII states: "All
personnel actions affecting [federal] employees ... in executive
agencies ... shall be made free from any discrimination based on
race, color, religion, sex, or national origin."   42 U.S.C. §
2000e-16.

Although a plaintiff may prove his claim of intentional
discrimination (or retaliation)[19] by direct or circumstantial
evidence, there is nothing in the record to indicate that the
plaintiff has direct evidence; accordingly, absent direct evidence
of disparate treatment or retaliation, Sterling must prove his
case through circumstantial evidence.   See McCoy v. City of
Shreveport, 492 F.3d 551, 556 (5th Cir. 2007).   Claims of
discrimination or retaliation based on circumstantial evidence are
analyzed in accordance with the familiar McDonnell Douglas burden-
shifting regime.   See Hunt v. Rapides Healthcare System, LLC, 277
F.3d 757, 768 (5th Cir. 2001).   This three-part framework first
requires the plaintiff to make a prima facie case of discrimination
(or retaliation).   Morris v. Town of Independence, 827 F.3d 396,
400 (5th Cir. 2016).   If the plaintiff makes this showing, a
presumption of discrimination (or retaliation) arises and the

---

[19] "[C]laims of intentional discrimination, which include racial
discrimination and retaliation based on Title VII [are considered]
under the same rubric of analysis."   Raggs v. Miss. Power & Light
Co., 278 F.3d 463, 468 (5th Cir. 2002).

burden of production shifts to the defendant employer to articulate a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action. Id. If the defendant satisfies that burden of production, then the inference of discrimination or retaliation disappears and the burden shifts back to the plaintiff, who must prove by a preponderance of the evidence that the proffered reason was merely a pretext for racial discrimination (or retaliation). Rogers v. Pearland Ind. Sch. Dist., 827 F.3d 403, 408 (5th Cir. 2016).[20] "[T]o demonstrate pretext sufficient to defeat a motion for summary judgment [on retaliation], an employee must produce evidence that could lead a reasonable fact-finder to conclude that 'the adverse [employment] action would not have occurred but for' the employee's decision to engage in activity protected by Title VII." Alkhawaldeh v. Dow Chemical Co., 851 F.3d 422, 427 (5th Cir. 2017). Notably, the Court does not assess the credibility of the employer's explanation. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)(explaining that the defendant's burden is one of production, not persuasion). To prove pretext, the plaintiff must

---

[20] Instead of pretext, a plaintiff may seek to establish that the plaintiff's protected characteristic/activity or the employer's discriminatory animus was a motivating factor for the adverse employment decision, but the plaintiff here has not advanced this mixed motive argument and, therefore, appears to pursue only a pretext theory.

demonstrate "*both* that the reason was false, *and* that discrimination was the real reason." <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (2007)(emphasis in original).

To make out a prima facie case of Title VII racial discrimination, Sterling must demonstrate that (1) he is a member of a protected group; (2) he was qualified for the position at issue; (3) he was subject to an adverse employment action; and (4) he was treated less favorably than a similarly situated employee outside of his protected group under nearly identical circumstances. <u>Lee v. Kansas City S. Ry. Co.</u>, 574 F.3d 253, 259 (5th Cir. 2009). To establish a prima facie case of retaliation, Sterling must present evidence that (1) he engaged in protected activity; (2) an adverse employment action resulted; and (3) the protected activity and the adverse action are causally linked. <u>Baker v. American Airlines, Inc.</u>, 430 F.3d 750, 754 (5th Cir. 2005)(citations omitted). "[T]o establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity[, which] requires 'more than mere curious timing coupled with speculative theories.'" <u>EEOC v. EmCare, Inc.</u>, 857 F.3d 678, 683 (5th Cir. 2017) (citations omitted).

Only ultimate employment decisions such as "hiring, granting leave, discharging, promoting, and compensation" constitute adverse employment actions in the context of Title VII race discrimination claims.   However, Title VII's antiretaliation provision is not limited to "ultimate employment decisions;" rather, an adverse employment action "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant.... [T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington No. & Santa Fe Ry. V. White, 548 U.S. 53, 68 (2006).[21]

---

[21] In Burlington Northern, the Supreme Court overruled the Fifth Circuit's stricter standard for adverse employment action in the retaliation context in a private sector case and clarified the standard for bringing a retaliation claim under Section 2000e-3(a), the private sector provision of Title VII.  The Court assumes without deciding that this standard applies equally to federal employees.  The Fifth Circuit has declined to decide whether the Burlington Northern standard only applies to private sector employees such that public sector employees alleging retaliation must satisfy the stricter standard by showing that there has been an ultimate employment decision such as hiring, granting leave, discharging, promoting, and compensating. Porter v. Shineski, 650 F. Supp. 2d 565, 573-74 (E.D. La. 2009)(observing trend among unpublished Fifth Circuit cases to apply Burlington Northern's standard to federal employees).

*B.*

1.  Disparate Treatment based on Race

The Secretary submits that he is entitled to judgment as a matter of law dismissing Sterling's disparate treatment claim because he cannot satisfy his prima facie burden of showing that he was treated less favorably than other similarly situated employees outside the protected group.  Even if he could satisfy his prima facie burden, the Secretary submits that the plaintiff cannot show that the Secretary's non-discriminatory reason for the reclassification delay was a mere pretext for discrimination.

As for Sterling's prima facie case of Title VII disparate treatment based on his race, there is no dispute that Sterling is a member of a protected class who was qualified for the position (to which he was ultimately reclassified).  As to the third aspect of the prima facie case, the Secretary takes issue with whether "denial of a desk audit" is an adverse employment action.  But that is an oversimplification and semantics do not dictate the presentation of issues in this case.[22]  More than being denied a

---

[22] The Court will not indulge form over substance in determining whether the facts of record fall within the limited scope of an adverse employment action where, as here, it is undisputed that Sterling's promotion/ reclassification was delayed and that -- once reclassified to a position in which he was being paid for the work he was doing -- Sterling was denied back pay.

desk audit, the facts in the record show that Sterling's promotion to a higher paying job was delayed, and that he was denied back pay once the promotion was effectuated.[23]  To be sure, a delay in a promotion, unaccompanied by any adverse effects, is not necessarily an adverse employment action.  See Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998)("[w]e need not address whether a mere delay in promotion constitutes an adverse employment action because Benningfield received the promotion with retroactive pay and seniority.").  But, here, it is undisputed that Sterling's promotion was delayed **and** he was denied back pay, which the case literature acknowledges is an adverse effect.  See id.; see also Dailey v. Whitehorn, 539 Fed.Appx. 409, 411-12 (5th Cir. 2013) (finding that the plaintiff cannot show adverse employment action in delayed promotion scenario where there was no accompanying adverse effect such as change in salary); see also Mylett v. City of Corpus Christi, 97 Fed.Appx. 473, 475 (5th Cir. 2004)("A delay in promotion is not an adverse employment action where any increase in pay, benefits, and seniority are awarded retroactively.").  There is no factual controversy that Sterling performed work consistent with a higher paying position for some

---

[23] Indeed, it is undisputed that Sterling was performing work above his pay grade for some time before being reclassified and getting compensated for the work he was actually doing.

time, but his technical promotion and reclassification were delayed by his employer, then back pay was denied; the adverse effect of the denial of back pay, which accompanied the delay in promotion, rises to the level of an adverse employment action.[24] He has satisfied this element of his prima facie case.

As to the final element of his prima facie case, to be considered a proper Title VII "comparator" for the purposes of the fourth "similarly situated" prong of the disparate treatment prima facie case, the plaintiff must show that the employment actions being compared occurred under "nearly identical circumstances." Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009). In defining the degree of similarity of comparators to complainants, the Fifth Circuit has instructed:

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated. Likewise, employees who have different work responsibilities or who are subjected to

---

[24] The Court acknowledges that the Secretary points to the appendix to the Introduction to the Position Classification Standards issued by the U.S. Office of Personnel Management in support of why Sterling was not eligible for back pay. However, no party mentions the case literature addressing promotion delays accompanied by failure to award back pay and, therefore, neither side addresses the conflict between the cited appendix and the case literature concerning what constitutes an adverse employment action under Title VII.

adverse employment action for dissimilar violations are
not similarly situated.  This is because we require that
an employee who proffers a fellow employee as a
comparator demonstrate that the employment actions at
issue were taken "under nearly identical circumstances."
The employment actions being compared will be deemed to
have been taken under nearly identical circumstances
when the employees being compared held the same job or
responsibilities, shared the same supervisor or had
their employment status determined by the same person,
and have essentially comparable violation histories.

Id. at 259-60 (noting, however, that "a requirement of complete or

total identity rather than near identity would be essentially

insurmountable" and, therefore, declining to interpret "nearly

identical" as synonymous with "identical.").

Whether Sterling has presented a threshold prima facie case

of racial discrimination thus turns on whether those he identified

as comparators are similarly situated to him.  If Sterling

establishes this fourth element of his prima facie case, the burden

shifts to the Secretary to demonstrate he had a legitimate

nondiscriminatory reason for taking the adverse action against

Sterling.

In his opposition papers, Sterling identifies the following

individuals as comparators:  David Dykes, Tim McGraw, and Cathy

Moser.  Without citations to the record,[25] Sterling submits that

---

[25] The Court considers Sterling's sworn statements concerning
comparators, but there is a dearth of information and no pin cite

David Dykes is like Sterling because he does similar work and, "[w]hen his supervisors became aware that Dykes, while classified as a 301 employee, was fully qualified to supervise the work of degreed engineers, he was quickly reclassified as a 881 employee supervisor."  As for Tim McGraw and Cathy Moser, again without citation to the record, Sterling suggests that these 301 series employees were reclassified "within a month of their job duties being assessed and determined to be non-commensurate with their compensation."  McGraw, it is submitted, was reclassified as an 1801 series employee and Moser, a geologist, was promoted to a 1350 series employee.  In his affidavit, Sterling states that Moser's reclassification occurred in 2011 and McGraw's occurred in 2014 "when the Bureau raised the salaries of its engineers and 1801 series employees."[26]  The Secretary takes issue with these comparators, arguing that "there is no assertion or evidence that

---

to the voluminous record indicating where additional facts might be found to assist the Court in determining whether Sterling has shown that other white employees were treated better under nearly identical circumstances.

[26] Notably, Sterling concedes that other 301 series employees, who performed different duties than Sterling, but who were also eligible for reclassification, but reclassification was delayed. Sterling concludes: "one could reasonably assume that [Caucasion employees] Nagy and Carroll's reclassification was only been delayed because they sought a reclassification with Belson [an African American employee]."

their reclassifications occurred during such bureaucratic upheaval."

The Court finds that Sterling has failed to carry his burden to show that the proffered comparators are sufficiently similarly situated to him.[27]  Sterling admits that he did not request a desk audit until September 2015.  Moser was a geologist whose reclassification from a 301 series employee to a 1350 series employee was achieved in 2011, which is when Sterling was promoted to GS-0301-13 series and which, he admits, is before he began performing duties that exceeded those traditionally prescribed for a 301 series employee.[28]  Sterling says that McGraw was promoted in 2014 "once management became aware that compensation was not commensurate with his job duties," but he offers little more on who initiated or how long the process took to elevate McGraw.[29]  Similarly, Sterling fails to identify more information regarding Dykes, making it difficult to determine whether Dykes is a suitable

---

[27] Again, Sterling concedes that other employees outside of the protected class likewise experienced delayed reclassification. This undermines his disparate treatment theory.
[28] The defendant submits that Moser was a geologist, which is nowhere close to a SEMS Specialist and that she worked under a different supervisor.
[29] As for McGraw, the defendant submits that he is an Inspector, occupies a different job series than Sterling, and reports to a different supervisor.

comparator or information on the circumstances and timing under which Dykes was promoted.[30]

Even if Sterling created an issue of fact concerning comparators, or otherwise established his prima facie case of race discrimination, the defendant submits that summary judgment is nevertheless appropriate because it has articulated a legitimate non-discriminatory reason for the delay in Sterling's reclassification: bureaucracy. That is, the Secretary submits that the delay in reclassifying Sterling resulted from a confluence of factors beginning with Sterling's initial supervisor, Mathews, who deemed it prudent to draft a new position description rather than initiate a desk audit. But Mathews' proposed position description was not accepted by HR's Vanessa Matthews. The realignment then brought Sterling into the new Office of Enforcement under new supervisor, Kovacs, who then took over the responsibility of drafting an acceptable position description. Kovacs worked with the staffing specialist from BSEE Headquarters, who had taken over for retired Vanessa Matthews. During this realignment time, the Secretary submits, there was increased demand Bureau-wide for new positions so several more months passed

---

[30] The defendant submits that Dykes is an engineer, a supervisor, a grade higher, and in a different job series than Sterling.

before Sterling's new position description was finalized and he was placed into the 1801 Investigator Series at a grade 13.

Sterling dismisses the Secretary's non-discriminatory reason, noting in conclusory fashion that "this purported excuse fails to refute Plaintiff's evidence of disparate treatment." Sterling seems to challenge the credibility of the Secretary's nondiscriminatory reason and urges the Court to decline to defer to it. In so arguing, the plaintiff ignores the familiar burden-shifting framework applicable to his claim.

Having proffered a non-discriminatory explanation for its inaction, the burden shifts to the plaintiff to prove by preponderant, admissible evidence that the reason is pretextual. Notably, the burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.'" Alvarado v. Texas Rangers, 492 F.3d 605, 611 (5th Cir. 2007) (citations omitted). "To overcome a legitimate, nondiscriminatory reason for termination, the plaintiff must show something beyond disagreement with the employer's decision." Wittmer v. Phillips 66 Co., 915 F.3d 328, 332 (5th Cir. 2019)(citation omitted). Indeed, the plaintiff must demonstrate "*both* that the reason was false, *and* that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515

(1993)(emphasis in original).   To be sure, "an employee's 'subjective belief of discrimination' alone is not sufficient" for an employee to satisfy his burden to produce "substantial evidence" of pretext.   Auguster v. Vermilion Parish Sch. Bd., 249 F.3d 400, 402-03 (5th Cir. 2001)(citations omitted).

To overcome the bureaucracy debacle excuse, Sterling must demonstrate pretext by showing that that explanation is false and by showing or raising a triable issue regarding disparate treatment.   The Secretary submits that Sterling has not produced any evidence that challenges its excuse for the delay in reclassification, other than to suggest that other BSEE employees had, in other circumstances, during different time frames, and in sections other than SEMS (or its succeeding iteration, the Office of Enforcement) obtained new position descriptions or position reclassifications with less hassle.   The Court agrees: the plaintiff submits no evidence to satisfy his "substantial burden" to show pretext.[31]

---

[31] The plaintiff also argues that the defendant fails to "cite a single instance of a Caucasian employee not receiving pay commensurate with their job duties and responsibilities," noting that "[t]he only example of Defendant dying or delaying a Caucasian employee fair compensation commensurate with his or her job duties and responsibilities was when that employee was grouped with other African American employees also seeking just compensation."   This argument ignores that it is the plaintiff's burden to prove pretext

34

The plaintiff has offered nothing that would undermine the Secretary's non-discriminatory explanation (i.e., that multiple supervisors met with red tape during a reorganization during the attempts to draft a new position description for Sterling), which is amply supported by the record.  The plaintiff likewise fails to offer any evidence that would support a finding that race played any part in the delay that preceded his reclassification.[32]  The defendant is entitled to judgment as a matter of law dismissing Sterling's Title VII disparate treatment claim based on race.[33]

---

and also appears to be a concession that the burden cannot be met on the undisputed record.

[32] Although the Court understands Sterling's frustration at the undisputed chaotic mismanagement and the length of time it took so many people to implement a new position description, viewing the evidence in the light most favorable to Sterling, there is no indication in the summary judgment record that racial animus played any part in the delay (and, as far as being denied back pay, according to the record, that was due to a written policy, not a subjective decision by the employer).  In fact, Sterling nowhere argues, much less presents supporting facts, as to how the reorganization and shuffling through a series of different supervisors disguised a motive for race discrimination against him. More particularly: (a) Sterling identifies employees outside of his protected class that he concedes likewise experienced delayed reclassification; and (b)  Sterling offers no evidence that any of his supervisors or HR personnel evinced a bias or treated more favorably similarly situated employees outside of his protected class under nearly identical circumstances.  Rather, he simply speculates that the delay must be due to his race. Speculation is not sufficient to withstand summary judgment.

[33] Cf. Butler v. Young, 1984 WL 49015, at *7 (D.D.C. Dec. 27, 1984):

> [The plaintiff's] underlying discontent reflects in part the rigidity and bureaucratic nature of the government's personnel structure and practices.  Title VII is not the

2.  Retaliation

The Secretary next submits that summary relief dismissing Sterling's Title VII retaliation claim is warranted because Sterling fails to make out a prima facie case.  The Court agrees.

To establish a prima facie case of retaliation, Sterling must present evidence that (1) he engaged in protected activity; (2) an adverse employment action resulted; and (3) the protected activity and the adverse action are causally linked.  Baker v. American Airlines, Inc., 430 F.3d 750, 754 (5th Cir. 2005)(citations omitted).  "[T]o establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity[, which] requires 'more than mere curious timing coupled with speculative theories.'"  EEOC v. EmCare, Inc., 857 F.3d 678, 683 (5th Cir. 2017) (citations omitted); DeHart v. Baker Hughes Oilfield Operations, Inc., 314 Fed.Appx. 437, 442-43 (5th Cir. 2007)(citations omitted)(Although "[c]lose timing between the protected activity and adverse

---

tool to remedy such deficiencies.  What is required instead is greater sensitivity on the part of personnel managers in the federal system and creation of more flexible personnel mechanisms to provide highly competent professionals of any race or sex expanded opportunity to serve the public in roles commensurate with their abilities.

36

employment action may provide a causal link[,] the mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case.").

There is no dispute that Sterling's formal EEO complaint filed on December 21, 2015 was protected activity. The defendant challenges Sterling's ability to show either an adverse employment action or a causal link between the protected activity and the adverse employment action. In March 2016, Sterling submits that his workload and stress level increased when the Nabors case was remanded and a few of his most difficult cases were fast-tracked by being assigned to the pilot program; he also seems to allege that his reclassification was still being dragged out and delayed and he was denied back pay. It seems at best arguable as to whether the remand or assigning cases to the fast track pilot program would dissuade a reasonable worker from making a charge of discrimination. Regardless of whether the remand, the cases added to the pilot program, and the further delay in reclassification/denial of back pay are adverse actions, however, Sterling has failed to establish the causation element of his prima facie case. He has not shown that his EEO complaint was a but-for cause of the Nabors case being remanded, his other cases being

37

added to the pilot program, or additional delay experienced in getting his position description reclassified.

The decision to remand the Nabors case and the decision as to which cases to allot to the CP Pilot Program were made nearly three months after his EEO complaint and, notably, those decisions were not made by Sterling's immediate superiors; he concedes those decisions originated in national headquarters, not regional management.[34]  In addition to the relative lack of temporal proximity between his EEO complaint and these employment actions, there is no evidence in the summary judgment record that any of these decisionmakers in national headquarters knew about his EEO activity.  Thus, any attempt to prove a causal link between his protected activity and these allegedly adverse actions fails.[35]

Finally, insofar as Sterling's reprisal submission can be read to challenge the defendant's failure to give him back pay

---

[34] Notably, it is undisputed that Sterling's immediate supervisors disagreed with the remand decision and that the CP Pilot Program was initiated in the Summer of 2015, which is before Sterling filed his EEO complaint.

[35] The record indicates that David Fish and Mary Aubrey were the decisionmakers on the Nabors remand decision.  Neither had any knowledge of Sterling's EEO activity until after Sterling filed his second complaint or at the earliest after the Nabors remand. Sterling points to nothing in the record to indicate that Diane Shawley, who selected the cases for inclusion in the CP Pilot Program -- a program that had its genesis in Summer 2015 -- had any knowledge regarding Sterling's December 2015 EEO complaint.

once his position description was finalized and realignment was effectuated, the record shows that Sterling was not awarded back pay because a written policy precluded such an award.  According to the written policy, no employee is eligible for back pay because an agency may not make a classification action effective retroactively.  Regardless of the fairness of this policy, Sterling cannot show that back pay was denied in retaliation for his protected activity.  The record shows that the defendant was simply applying a general policy to Sterling, not retaliating against him for complaining about racial discrimination.  See Manning v. Chevron Chemical Co., LLC, 332 F.3d 874, 884 (5th Cir. 2003).

Accordingly, for the foregoing reasons, IT IS ORDERED that the defendants' motion to dismiss or for summary judgment is GRANTED; the plaintiff's claims are hereby dismissed with prejudice.

New Orleans, Louisiana, March 18, 2019

_____

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE